*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0208**

Hountcheme Y.A. Gbeyetin,
Relator,

vs.

Department of Employment and Economic Development,
Respondent

**Filed September 21, 2015
Affirmed
Ross, Judge**

Department of Employment and Economic Development
File No. 33082471-2

Hountcheme Y.A. Gbeyetin, Minnetonka, Minnesota (pro se relator)

Lee B. Nelson, Timothy Schepers, Department of Employment and Economic
Development, St. Paul, Minnesota (for respondent)

        Considered and decided by Larkin, Presiding Judge; Ross, Judge; and
Chutich, Judge.

## U N P U B L I S H E D   O P I N I O N

**ROSS**, Judge

        Hountcheme Gbeyetin quit his production-assembly job because of a change to his
childcare arrangement that interfered with his work schedule. Gbeyetin applied for
unemployment benefits, and an unemployment law judge determined that he was

ineligible to receive them. Because the record supports the judge's findings that Gbeyetin restricted the hours that he is available to work and that he is therefore not available for suitable replacement employment, we affirm.

**FACTS**

Hountcheme Gbeyetin worked full time as an assembler for Datacard Corporation from March 2011 to October 2014. Gbeyetin quit his job and applied for unemployment benefits. The department of employment and economic development determined that he is ineligible to receive those benefits, and Gbeyetin appealed that determination administratively.

An unemployment law judge (ULJ) conducted an evidentiary hearing during which Gbeyetin explained the circumstances of his decision to quit. He said that he became sole custodian of his six-year-old son in February 2014. He had previously worked shifts from 6:30 a.m. to 3:30 p.m. and was dropping his son off and picking him up from a preschool before and after each shift. The difficulty arose when his son started kindergarten in September 2014. The school bus that services Gbeyetin's home was scheduled to pick the child up later than two hours into Gbeyetin's scheduled shift. It would arrive at 8:51 a.m. before school and drop the child off at 4:00 p.m. after school. Gbeyetin could therefore no longer report to work on time unless he arranged for a different pick-up point for the child and found someone or some daycare facility that could receive his son earlier than 6:30 a.m. and put him on the school bus. Gbeyetin attempted unsuccessfully to find a suitable provider to accommodate these circumstances.

Gbeyetin informed his supervisor of the change in his childcare schedule days before his son was scheduled to start school. He requested to work from 9:30 a.m. to 2:30 p.m. so he could accommodate his son's bus schedule. Gbeyetin's supervisor, Joshua Haugland, informed Gbeyetin that Datacard "[does] not allow employees to be part time employees" because "[i]t is something [the company has] never done and never will." Haugland told Gbeyetin that Datacard could not accommodate the requested 9:30 to 2:30 work schedule but that Gbeyetin could use vacation time until he made other arrangements for his son. Gbeyetin used his vacation time to supplement his shortened work schedule, but he soon expended all of it without succeeding to make other care and transportation arrangements. He resigned effective October 9, 2014.

Gbeyetin testified that, even at the date of the hearing, he still lacked a suitable childcare arrangement. He had applied for several jobs. Some required a 6:00 a.m. start time. Others allowed a 9:00 a.m. start time. Gbeyetin explained that unless he found morning daycare he could not work at a job that started before 9:15 a.m. The ULJ asked how early he could work each day, and Gbeyetin answered, "The earliest time would be at 9:00, 9:00 or 9:15, depending on the commute." He then clarified, "[N]ot 9:00, no [earlier than] 9:15 because the bus pick[s] [my son] up at 8:51." He also stated that he had no neighbors, family, or anyone else who could provide the interim care for his son.

The ULJ determined that Gbeyetin is not eligible for unemployment benefits. She found that although he quit his job and would ordinarily be automatically ineligible for benefits, by quitting due to a loss of childcare, Gbeyetin qualified for an exception to ineligibility under Minnesota Statutes section 268.095, subdivision 1. But eligibility also

3

depends on the applicant's continued availability for suitable work, and she also found that Gbeyetin did not meet that eligibility requirement under Minnesota Statutes section 268.085, subdivision 15. The ULJ received evidence that the employment in the field, and the employment to which Gbeyetin had applied, normally includes positions during hours in which Gbeyetin cannot work. She made relevant findings and reasoned as follows:

> The preponderance of the evidence shows that Gbeyetin was not available for suitable employment beginning October 12, 2014. Gbeyetin is available at 9:15 a.m. He cannot work before 9:15 a.m. This prevented him from continuing work at Data Card. It prevents him from performing any work that begins before 9:15 a.m. Therefore, Gbeyetin is not available for a full, daytime shift and is not available for suitable employment.

Gbeyetin requested that the ULJ reconsider her decision, and the ULJ affirmed her decision denying benefits. She stated that because Gbeyetin testified that he had to be home at 8:51 to put his son on the bus and because "suitable employment for Gbeyetin includes assembly work which may start before 8:00 a.m.," Gbeyetin is not available for suitable employment. Gbeyetin appeals by writ of certiorari.

## D E C I S I O N

The ULJ denied Gbeyetin's request for unemployment benefits because, although he qualified under a quit-ineligibility exception, he is ineligible because he is not available for suitable employment. An applicant for unemployment benefits must be available for suitable employment to receive benefits. Minn. Stat. § 268.085, subd. 1(4) (2014). The legislature has defined "suitable employment" as "employment in the

4

applicant's labor market area that is reasonably related to the applicant's qualifications." Minn. Stat. § 268.035, subd. 23a(a) (2014). "An applicant may restrict availability to suitable employment, but there must be no other restrictions, either self-imposed or created by circumstances, temporary or permanent, that prevent accepting suitable employment." Minn. Stat. § 268.085, subd. 15(a) (2014). Someone who restricts the hours he can work is not "available" for suitable employment under the statute if the restricted hours "are not normal for the applicant's usual occupation or other suitable employment." *Id.*, subd. 15(d) (2014). Whether an applicant is available for suitable work is a finding of fact that this court reviews to determine if it is reasonably supported by the evidence. *Semanko v. Dep't of Emp't Servs.*, 309 Minn. 425, 428, 244 N.W.2d 663, 665 (1976).

Substantial evidence supports the ULJ's finding that Gbeyetin has not made himself available for suitable employment. At the time of the evidentiary hearing, Gbeyetin had still not secured childcare or alternative transportation for his son, and he could not start working earlier than 9:15. He stated that he had applied for some jobs that start at 9:00, but nothing in the record indicates that he could or would accept any of those positions if they required that he begin work on time. And nothing in the record suggests that any employer would allow Gbeyetin to begin his shift later than 9:00 or leave early enough for him to be home before the afterschool drop off. Gbeyetin asserts on appeal that he is "able to work standard hours during the day to secure employment, not limited by the pick up and drop off times." But we must base our review of the ULJ's decision on the facts before her, and Gbeyetin's argument on appeal contradicts the

5

testimony he provided at the evidentiary hearing. He does not explain how the ULJ erred by relying on that testimony. Nor has he asserted that there is, within the meaning of the statute, "other suitable employment" that would accommodate his restricted work schedule. Even if he had, the record does not support a finding that he is qualified for any jobs outside the production jobs that he had been applying for, many of which include 6:00 a.m. start times.

We appreciate that one might perceive a theoretical incongruity between the two statutory provisions—one being the exception allowing for a preliminary finding of eligibility because the person's reason for quitting is to provide childcare, and the other foreclosing an ultimate determination of eligibility when the person's reason for continued unemployment is his childcare schedule. But one might just as reasonably suppose that the legislature intended to be more accommodating to a parent's sudden, work-inhibiting childcare need than to his ongoing inability to find solutions to that need. And in any event, it is not the court's role to reconstruct express statutory language to fix purported gaps in the statute or to effectuate what we speculate might be the legislature's purpose. And to the extent the result here may seem uncompassionate, the legislature has also clarified that the ULJ must not make eligibility determinations on equitable grounds. Minn. Stat. § 268.069, subd. 3 (2014).

**Affirmed.**